IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOHNATHON BYRNE,<br><br>        Plaintiff,<br><br>v.<br><br>MICHAEL K. YOUNG,<br>J. MICHAEL RAGAN, AND<br>JOHN DOE TEXAS A&M UNIVERSITY POLICE OFFICERS #1-4,<br><br>        Defendants. | No. _____ |

## COMPLAINT

This is a Section 1983 suit alleging violations of Plaintiff Johnathon Byrne's First, Fourth, and Fourteenth Amendment rights by Defendant Michael K. Young ("Young"), in his official capacity as President of Texas A&M University ("TAMU"); Defendant J. Michael Ragan ("Ragan"), in his official capacity as Chief of TAMU Police, and in his individual capacity; and Defendants John Doe TAMU Police Officers #1-4, in their official capacities as officers of the TAMU police department, and in their individual capacities.

## INTRODUCTION

1.  Defendants violated Plaintiff's right to free speech by banning him from TAMU's campus—which contains traditional and designated public fora—for two years because of the content and viewpoint of his speech.

2.  In September 2018, Plaintiff went to TAMU to voice his concerns about TAMU's dog lab which conducts cruel and ineffectual experiments on dogs in the name of researching cures to muscular dystrophy.

1

3. Plaintiff attended an off-campus dinner in San Antonio—for which he purchased a ticket—to voice his concerns about the dog lab to TAMU President Young. At the dinner, Plaintiff approached President Young and told him he opposes the dog lab. Plaintiff was then asked to leave, which he did immediately. The following day, Plaintiff hand-delivered a letter to President Young's office describing his concerns with the dog lab. The day after that, Plaintiff visited the TAMU dog lab where he was let in by the receptionist. Within minutes of arriving at the lab, Plaintiff was confronted by four police officers who detained him and issued him a criminal trespass warning banning him from TAMU for two years. When Plaintiff asked why he was being detained and subsequently banned from campus for two years despite the fact that he all he had done was enter a publicly accessible building, he was told, "Based on the history, they don't want you here." Accordingly, Defendants violated Plaintiff's right to be free from a false arrest and Plaintiff's due process rights by detaining him without probable cause and violated Plaintiff's right to free speech by banning him from a public university because of the content of his speech.

4. This suit seeks prospective injunctive relief from Defendants in their official capacities, and compensatory and punitive damages from Defendant Ragan and Defendants John Doe TAMU Police Officers #1-4 in their individual capacities.

**PARTIES**

5. Plaintiff, Johnathon Byrne, is a citizen of the United Kingdom who suffers from muscular dystrophy, a disease that causes progressive weakness and loss of muscle mass. Because of the disease, he is unable to walk and requires the use of a wheelchair at all times. In 2017, Mr. Byrne learned that TAMU had a laboratory devoted to breeding dogs to have a canine form of Duchenne Muscular Dystrophy ("DMD"). Since learning about TAMU's dog lab, Mr. Byrne has devoted substantial time to speaking out against the cruelty of breeding dogs to have such a painful and

debilitating disease. In September 2018, Mr. Byrne traveled to TAMU's College Station campus to voice his concerns about TAMU's cruel dog experiments. As a result, TAMU banned him from campus for a period of two years because of the content of his speech and his anti-dog-experiment viewpoint.

6.      Defendant Michael K. Young is president of TAMU. He has authority over TAMU policies and practices, including those challenged here. Plaintiff sues him in his official capacity for prospective injunctive relief only. TAMU is a public research university located in College Station, Texas, and is the second largest public university by student enrollment in the United States. At all times relevant to this suit, Defendant Young acted under color of law.

7.      Defendant J. Michael Ragan is chief of police of the University Police Department at TAMU. He oversees the police department that was responsible for issuing the trespass warning and two-year campus ban to Plaintiff. Plaintiff sues him in his official capacity for prospective injunctive relief and in his personal capacity for compensatory and punitive damages. At all times relevant to this suit, Defendant Ragan acted under color of law.

8.      Defendants John Doe TAMU Police Officers #1-4 are four officers of the University Police Department at TAMU. They jointly and severally issued a trespass warning and two-year campus ban to Plaintiff. Plaintiff sues them in their official capacities for prospective injunctive relief and in their personal capacities for compensatory and punitive damages. At all times relevant to this suit, Defendants John Doe TAMU Police Officers #1-4 acted under color of law.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343. Pursuant to 28 U.S.C. § 1331, district courts have original jurisdiction over all civil actions arising under the Constitution. Pursuant to 28 U.S.C. § 1343, district courts have original jurisdiction over any

civil action commenced to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States.

10. This is a suit brought under 42 U.S.C. §§ 1983 and 1988.

11. Venue in this Court is proper under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants are residents of this district and because all the events detailed herein occurred within this Court's judicial district.

## STATEMENT OF FACTS

12. *"President Young, I have muscular dystrophy, and I'm here to talk to you about the debilitating research being done at A&M University. I would like to call upon you to stop the research on the animals, the dogs, at this university, where they are suffering in pain, they are unable to breathe, eat, and walk. I know firsthand how awful this is." Johnathon Byrne to TAMU President Michael K. Young, September 5, 2018, at San Antonio, Texas.*[1]

13. In 2017, Mr. Byrne learned that TAMU houses a laboratory in which golden retrievers are bred to have a canine form of DMD.  Mr. Byrne learned that TAMU experimenters repeatedly stretch the dogs' legs with a motorized lever to cause muscle tears; that puppies born in this laboratory with DMD are so weak at birth they require extra nutrition; that, by six weeks of age, their hind limbs shift forward, making walking difficult; and that some of the dogs are unable to open their mouths or jaws.  Mr. Byrne learned that even the dogs who are not bred with DMD—those who serve as experimental controls—are nevertheless confined to living in cages.  Mr. Byrne

---

[1] A video of Plaintiff's speech is available at https://www.peta.org/blog/video-johnathon-byrne-tells-tamu-president-shut-the-dog-lab-down/. Katherine Sullivan, *The Powerful Moment This Activist with MD Condemns TAMU's Dog Lab*, PETA Blog (Sept. 7, 2018).

learned that the principal researcher behind these experiments, Dr. Joseph Kornegay, has repeated them for decades. These decades of cruelty have not yielded a single cure for human patients.

14. Knowing from his personal experience the suffering that results from muscular dystrophy, Mr. Byrne decided to go to TAMU to learn as much as possible about the laboratory and the breeding, exploitation, and confinement of the dogs there.to publicize his findings, and to advocate for the lab's closure.

15. Because of Mr. Byrne's muscular dystrophy, he requires the help of an assistant when he travels. Christina Probert accompanied Mr. Byrne on his trip to TAMU as his assistant.

### I.     Michael K. Young Dinner

16. Mr. Byrne traveled from the United Kingdom to Texas to attend a ticketed dinner event which Defendant Young was scheduled to be at. The dinner took place on Wednesday, September 5, 2018, in San Antonio, Texas. Mr. Byrne arrived at the event, checked in at the reservation desk, and was shown to his table.

17. Later that evening, Mr. Byrne approached Defendant Young and began to detail his concerns about the laboratory and its methods, and, in particular, the inhumane treatment of the dogs.

18. A security guard approached Mr. Byrne and asked how he got inside the event. Mr. Byrne responded, "You opened the door for me, sir." The guard told Mr. Byrne he was trespassing, but Mr. Byrne answered that he was on the event's guest list. The guard then ordered Mr. Byrne to leave, and he complied.

19. Outside of the dining room, Mr. Byrne was detained and accused of trespassing, and his identification was taken from him. Law enforcement officers were called to the scene. After detaining Mr. Byrne, the officers released him without charge.

## II. Michael K. Young Office Visit

20. The following day, September 6, 2018, Mr. Byrne went to Defendant Young's office located in a building open to the public on the TAMU campus to hand-deliver a letter urging closure of the dog laboratory. When Mr. Byrne arrived at Defendant Young's office, a TAMU police officer was already there. Mr. Byrne asked to deliver the letter to Defendant Young and to speak with him. The officer said that Defendant Young was not there.

21. Mr. Byrne then asked to talk to a secretary. The secretary came out to speak to Mr. Byrne and Mr. Byrne gave her the letter for Defendant Young.

22. Mr. Byrne then got into the elevator and left the building. TAMU police watched Mr. Byrne as he left and followed him outside for a few kilometers, despite the fact that Mr. Byrne had done nothing improper.

23. Mr. Byrne then joined several students to leaflet and protest the laboratory. The group stood on or near a public sidewalk that adjoins TAMU's campus and held banners. Mr. Byrne spoke with students about the dog laboratory, many of whom were upset to learn that TAMU has engaged in fruitless and cruel experiments on dogs on their campus.

## III. TAMU Dog Laboratory Visit and Campus Ban

24. The following day, September 7, 2018, Mr. Byrne, along with his assistant, Christina Probert, and TAMU student, Kristian Cantens, went to the building that houses the dog laboratory to learn about the laboratory in person. Mr. Byrne hoped to meet the dogs and learn more about the experimentation from the staff.

25. Mr. Byrne approached the building and rang the doorbell. A receptionist let him, Ms. Probert, and Mr. Cantens inside. Mr. Byrne explained that he was visiting from the United Kingdom, that he suffers from muscular dystrophy, and that he knew the laboratory was

6

conducting experiments on dogs related to muscular dystrophy. He stated that he would like to learn more about the experiments and asked to speak with staff.

26. The receptionist responded that she did not see why Mr. Byrne should not be permitted to speak with laboratory staff and asked Mr. Byrne and his companions to take a seat.

27. At no point did the receptionist or any other laboratory staff ask Mr. Byrne or his companions to leave. Mr. Byrne entered the premises as any other member of the public would: by ringing the doorbell and identifying himself to the receptionist, then waiting in the reception area as directed. At no point did Mr. Byrne trespass or otherwise enter any area without authorization.

28. Approximately five minutes later, Mr. Byrne noticed several TAMU police cars outside the building. John Doe TAMU Police Officers #1-4, who were armed, entered the building and approached Mr. Byrne. At that point, Mr. Byrne began recording his interaction with the officers on his mobile phone. Mr. Byrne explained to the officers that he suffers from muscular dystrophy and has an interest in the experiments being conducted at the dog laboratory. He explained that he was waiting in the reception area as directed by the receptionist and had asked to speak to laboratory staff.

29. John Doe TAMU Police Officers #1-4 knew Mr. Byrne by name and knew he was visiting from the United Kingdom before he provided that information to them. Upon information and belief, that information was either provided to TAMU police by another police department following the San Antonio dinner with Defendant Young two days before or ascertained from the letter he hand-delivered to Defendant Young the day before.

30. John Doe TAMU Police Officer #1 issued a "criminal trespass warning" to Kristian Cantens, the TAMU student who had accompanied Mr. Byrne to the dog laboratory. The officer

informed Mr. Cantens that "because you are a student here the warning is only for this building." Confused, Mr. Cantens responded, "I came into the building, but nobody told me to leave. It's not like I broke in." John Doe TAMU Police Officer #2 said, "You are not getting any kind of charge or anything right now, [but] if you come back you will." Mr. Cantens asked, "But on what grounds am I being banned from a building?" One of the John Doe TAMU Police Officer Defendants responded, "The people who run this building don't want you here."

31. John Doe TAMU Police Officer #3 told Mr. Cantens, "Your actions caused this," to which Mr. Cantens replied, "My action consisted of stepping through a door." John Doe TAMU Police Officer #3 said, "There's history with you, so don't sit and tell me all you did was just walk through a door." Mr. Cantens responded, "That's all I did." John Doe TAMU Police Officer #2 said, "What this [criminal trespass warning] means is that, if you come into this building at any time in the next two years, you will be arrested."

32. Upon information and belief, the "history" alluded to by John Doe TAMU Police Officer #3 refers to Mr. Cantens's previous First Amendment-protected speech in protest of the dog laboratory, namely using chalk to stencil a message on a TAMU sidewalk, as discussed below, and as allowed by TAMU's sidewalk chalking policy.

33. John Doe TAMU Police Officer #2 turned to Mr. Byrne and Ms. Probert and said to them, "Since you all two are not affiliated with Texas A&M [and] you're not students, [the ban] is going to be for all A&M property. Meaning if you come back on A&M property anywhere you will be arrested."

34. Mr. Byrne responded, "Can we ask the reason for that? What have we done here that's criminal for us to be banned?" John Doe TAMU Police Officer #2 responded, "Based on the history, they don't want you here—you all have no business being here. That's how it's going to

be." Mr. Byrne said, "We have been respectful here." John Doe TAMU Police Officer #2 replied, "No one said you haven't been." Mr. Byrne explained, "If we had been asked to leave, we would have gone and there would have been no reason for you guys to waste your time." John Doe TAMU Police Officer #2 replied, "If there had been no history here that would have been the case but since this is a repeat thing, we are going to have to go a different route." Mr. Byrne said, "It's not really a repeat thing because I just turned up." John Doe TAMU Police Officer #3 said, "Think about it this way; if you come to my house and I don't like you I can tell you to leave." Mr. Byrne said, "If they had asked us to leave, we would have."

35. One of the John Doe TAMU Police Officers then handed Mr. Byrne a "criminal trespass warning" banning him from the TAMU campus for two years. *See* Exhibit A (photograph of trespass warning given to Mr. Byrne).

36. John Doe TAMU Police Officers #1-4 unlawfully and without probable cause detained Mr. Byrne and questioned him for approximately forty to forty-five minutes before releasing him and ordering him to leave TAMU's campus. During the detention period, Mr. Byrne asked if they were free to go; the officers replied that they were not free to go.

37. Mr. Byrne and Ms. Probert left TAMU's campus and convened at a Starbucks coffee shop near campus. Mr. Byrne noticed that unknown police officers were surveilling them while they sat in the Starbucks from a marked patrol car parked outside. When Mr. Byrne waved to the officers, they drove off.

## IV. Austin-Bergstrom Airport

38. The night of Mr. Byrne's visit to the dog laboratory, September 7, 2018, he and Ms. Probert drove to Austin to spend the night before their return flight to the United Kingdom the next day.

9

39. On September 8, 2018, Mr. Byrne and Ms. Probert arrived at Austin-Bergstrom Airport for their flight. They checked their luggage and proceeded to security screening.

40. At the screening area, two Transportation Security Administration (TSA) agents and a woman holding a clipboard separated Mr. Byrne from Ms. Probert and took him through the wheelchair security area.

41. Security officials cleared another person in a wheelchair, in front of Mr. Byrne, in roughly two minutes.

42. TSA agents spent approximately forty minutes to an hour screening Mr. Byrne. They repeatedly asked him to perform physical tasks that he informed them he is incapable of performing because of his muscular dystrophy. For example, TSA agents asked Mr. Byrne to stand up and to take off various items of clothing. Mr. Byrne told the agents he cannot stand and cannot undress without the assistance of another person. Nevertheless, the TSA agents were unrelenting and persisted in demanding that Mr. Byrne perform tasks he cannot perform in public without offering Mr. Byrne a private screening. As a result, Mr. Byrne felt humiliated and as though he was being treated like a suspected terrorist.

43. The search was physically grueling. Mr. Byrne suffered physical pain from attempting to comply with the TSA agents' demands that he perform certain physical actions.

44. Mr. Byrne, a frequent international airline traveler, had never been treated in this manner in any airport in the world.

45. After forty-five minutes to an hour of physically invasive screening, the woman holding the clipboard told Mr. Byrne that he could proceed to the secure area of the airport. Mr. Byrne rejoined Ms. Probert on the secure side of the screening area. One of the TSA agents who searched Mr. Byrne watched him and Ms. Probert from a distance.

46. A few minutes later, two police officers of an unidentified agency approached Mr. Byrne and Ms. Probert. One of these officers said, "We just want to make sure you get to your plane safely, sir." Mr. Byrne told the officer that his escort was not necessary, but the officers insisted, repeating the same line. The officers escorted Mr. Byrne and Ms. Probert to their gate and stayed with them until they boarded.

### V. TAMU Campus Ban of Non-Party Matt Bruce

47. Mr. Byrne's case is not the first time TAMU has banned a critic of its dog laboratory from its campus in violation of the First Amendment.

48. On August 27, 2018, non-party Matt Bruce and Mr. Cantens used a water-soluble chalk-dust paint to chalk a message on the sidewalk in front of Evans Library at TAMU. The paint washes away when exposed to water. The stencil read: "TAMU: Shut the Dog Lab Down Now." This chalking fully complied with TAMU's policy on the chalking of sidewalks, which is permitted when done with water-soluble chalks on flat, horizontal surfaces that are fully exposed to the rain. *See* TAMU Standard Admin. P. 51.99.99.M0.02, Campus Signage, at 2.2.4.2 (revised Feb. 22, 2018), *available at* http://rules-saps.tamu.edu/PDFs/51.99.99.M0.02.pdf.

49. Four TAMU police officers approached Mr. Bruce and Mr. Cantens, demanded their identification, and said they received a report that the men were painting on the sidewalk. Mr. Bruce demonstrated for the officers that the paint was made of chalk dust by drawing a line on the sidewalk and washing it away with water.

50. Despite demonstrating that the chalking fully complied with TAMU policy, the TAMU police officers illegally detained Mr. Bruce and Mr. Cantens for approximately one hour, without probable cause, during which time several additional officers arrived. At one point, Mr. Bruce and Mr. Cantens were surrounded by eight police officers. Mr. Bruce asked for his identification card

back so that he could leave, but the officers refused to return it. Throughout the course of the time the men were detained, Mr. Cantens asked several times if they could leave. Each time he was told no.

51. TAMU police officers issued Mr. Bruce a "criminal trespass warning" banning him from TAMU's campus for two years.

52. Through counsel, Mr. Bruce sent a letter dated October 18, 2018 to, among others, Defendant Young and Defendant Ragan, demanding that TAMU lift the campus-wide ban of Mr. Bruce and threatening to bring suit if TAMU did not lift the ban. By letter dated November 14, 2018, Defendant Ragan notified Mr. Bruce that the ban had been lifted.

## VI. TAMU Campus Speech Policies

53. Upon information and belief, Defendant Ragan and Defendant Young have the authority to lift the campus ban of Plaintiff Johnathon Byrne.

54. University sidewalks and outdoor spaces are designated public fora and, accordingly, restrictions on speech must satisfy strict scrutiny review.

55. TAMU goes one step further and considers its campus streets, sidewalks, parks, and similar common areas to be traditional public forums, which are afforded the greatest amount of First Amendment protection. *See* Appendix XI: Texas A&M Rules on Freedom of Expression, Texas A&M University Student Rules, at I (2015), *available at* https://student-rules.tamu.edu/append11/; *see also* "Expressive Activity," Texas A&M University Procedures, Policies, and Practices, Division of Student Affairs Expressive Activities Committee, at 21 (May 2018), *available at* http://provost.tamu.edu/Provost/media/Assets/pdfs-essentials/Access-Expressive-Activity-0618.pdf.

56. TAMU considers its traditional public forums to be open to students and non-students alike. *See* Appendix XI: Texas A&M Rules on Freedom of Expression, Texas A&M University Student Rules, at I (2015), *available at* https://student-rules.tamu.edu/append11/; *see also* "Expressive Activity," Texas A&M University Procedures, Policies, and Practices, Division of Student Affairs Expressive Activities Committee, at 21 (May 2018), *available at* http://provost.tamu.edu/Provost/media/Assets/pdfs-essentials/Access-Expressive-Activity-0618.pdf.

57. Permissible restrictions on speech in a traditional or designated public forum must be content-neutral, narrowly drawn to achieve a significant government interest, and must leave open ample alternative channels for communication. TAMU's two-year-long campus-wide ban of Mr. Byrne is not content-neutral, is not narrowly drawn to achieve a significant government interest and does not leave open any alternative channels for communication. Accordingly, it constitutes a First Amendment violation.

58. TAMU's ban of Mr. Byrne is not content or viewpoint neutral because it targets Mr. Byrne because of the substance of his speech, namely his critique of the dog lab. Upon information and belief, TAMU has not issued any campus-wide bans to speakers who praise the dog laboratory. Indeed, TAMU alumna Kristen Cox is one of the laboratory's greatest boosters and has met with Defendant Young to discuss its future.

59. TAMU's ban on Mr. Byrne does not serve any government interest, much less a significant one. Mr. Byrne peacefully leafleted on or near TAMU's campus, hand-delivered a letter to Defendant Young's office, and respectfully requested to speak with dog laboratory staff.

60. TAMU's ban on Mr. Byrne forecloses all alternative channels for him to express his views consistent with the First Amendment. Under the ban, Mr. Byrne is prohibited from entering the

TAMU campus for two years. He is unable to access the campus' public fora, to present his viewpoint of the dog laboratory, or to engage freely with students, staff, or other passersby, as he has done before the ban was implemented and as he would like to do after the ban is lifted. Other channels of communication that may exist outside the campus do not permit Mr. Byrne to reach his intended audience of TAMU students and staff for face-to-face conversations.

## CAUSES OF ACTION

### COUNT I
### Deprivation of First Amendment Rights

61. Plaintiff repeats the allegations set forth above as if fully set forth herein.

62. Defendants' TAMU-campus ban violates the First Amendment because:

    1. it is viewpoint-based discrimination;

    2. it is content-based discrimination, including speaker-based discrimination against Mr. Byrne;

    3. the streets, sidewalks, parks, and similar open spaces of TAMU's campus are, at a minimum, designated public forums, thus triggering the requirement that any restrictions on speech in those locations be narrowly tailored to a significant government interest, and TAMU's restriction on Mr. Byrne's speech fails to satisfy this requirement; and

    4. it forecloses all alternative channels of communication by entirely excluding Mr. Byrne from TAMU's campus for a period of two years.

### COUNT II
### Deprivation of Fourth Amendment Rights

63. Plaintiff repeats the allegations set forth above as if fully set forth herein.

64. Defendants' detention of Plaintiff violates the Fourth Amendment because:

1. Defendants detained Mr. Byrne for approximately forty to forty-five minutes before issuing him a "criminal trespass warning" and allowing him to leave campus;

2. Defendants detained Mr. Byrne without probable cause;

3. Despite having no probable cause to detain him, Defendants told Mr. Byrne he was not free to leave, thereby effectuating a false arrest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A. Declare that TAMU's ban on Mr. Byrne from TAMU's campus is unconstitutional;

B. Enter an injunction requiring all Defendants to lift TAMU's ban on Mr. Byrne from TAMU's campus;

C. Award Mr. Byrne compensatory and punitive damages against Defendant Ragan and Defendants John Doe TAMU Police Officers #1-4, in their individual capacities, in amounts to be set at trial;

D. Award Mr. Byrne his costs, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988(b); and

E. Grant any additional relief as may be just and proper.


DATED: May 30, 2019                RESPECTFULLY SUBMITTED,

                                   Johnathon Byrne


                                   By:   / s/ Daphne Pattison Silverman
                                         Daphne Pattison Silverman
                                         Silverman Law Group
                                         501 N IH 35
                                         Austin, Texas 78702
                                         Phone: 512-975-5880

                    Fax: 512-597-1658
                    TX Bar No: 06739550

By:    <u>/s/ Thomas Connolly</u>
        Thomas G. Connolly
        Harris, Wiltshire & Grannis LLP
        1919 M Street N.W. Suite 800
        Washington, D.C. 20036
        Phone: 202-730-1339
        Fax: 202-730-1301
        tconnolly@hwglaw.com
        Pro hac application to be filed